**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| DEBRA HENDERSON, | ) | CASE NO. 1:13-CV-02512 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Debra Henderson ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

On January 7, 2011, Plaintiff filed her application for SSI, alleging a disability onset date of October 1, 2010.  (Transcript ("Tr.") 86.)  The claim was denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.*)  On May 21, 2012, an ALJ held Plaintiff's hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On June 12, 2012, the ALJ found Plaintiff not disabled.  (Tr. 1.)  On September 24, 2013, the Appeals Council

declined to review the ALJ's decision, and the ALJ's decision became the

Commissioner's final decision.  (Tr. 1.)

On November 12, 2013, Plaintiff filed her complaint to challenge the

Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in

this case.  (Doc. Nos. 15, 16.)

Plaintiff asserts the following assignments of error: (1) The ALJ erred in analyzing

Plaintiff's pain and credibility; and (2) the ALJ erred in failing to assign appropriate

weight to the opinions of Plaintiff's examining physicians.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in February 1960 and was 50-years-old on the date she filed

her application.  (Tr. 93.)  She had at least a high school education and was able to

communicate in English.  (*Id.*)  She had past relevant work as a Nurse's Assistant.  (*Id.*)

### B.    Medical Evidence

#### 1.    Physical Impairments

##### a.    Medical Reports

Plaintiff received treatment for low back pain in March 2010.  (Tr. 304.)  Pamala

Murphy, M.D., observed evidence of tenderness and spasm in the area of Plaintiff's

lumbosacral spine and recommended over-the-counter pain medication.  (Tr. 306.)

On July 7, 2010, Plaintiff presented to Candia K. Luby, N.P., with complaints of low back

pain radiating down her posterior buttocks.  (Tr. 297.)  Plaintiff denied any injuries or

falls but indicated that an increase of her work duties as a housekeeper caused her

2

pain.  (*Id.*)  A back exam revealed tenderness in the right lumbar region and negative straight-leg raise bilaterally at 90 degrees.  (Tr. 298.)

Radiology reports from February 2011 reveal normal heart and lungs, a minimally displaced fracture of Plaintiff's right ankle, mild dextroscoliotic curvature of Plaintiff's thoracolumbar spine, mild degenerative joint disease of the apophyseal joints, no significant pathology of Plaintiff's brain, and a normal cardiac silhouette.  (Tr. 394-400.)

In March 2011, Plaintiff complained of headache and paresthesias of the left arm. (Tr. 463.)  A toxicology screen was positive for cocaine, and Plaintiff admitted to using crack cocaine.  (*Id.*)  Examination findings were unremarkable, and a CT of Plaintiff's head revealed negative results.  (*Id.*)  Thomas Wido, M.D., diagnosed cephalgia with paresthesias, cocaine use, and hypertension, and provided medication to treat Plaintiff's symptoms.  (Tr. 464.)  An April 2011 radiology report revealed moderate degenerative changes in Plaintiff's hips.  (Tr. 497.)

In September 2011, Dr. Murphy completed a fill-in-the-blank, check-box form in which she opined that Plaintiff's impairments, including severe osteoarthritis of the hips and hypertension, were unstable conditions that caused permanent functional limitations.  (Tr. 526.)  Dr. Murphy opined that Plaintiff was unable to work even if accommodations were made for her disability.  (*Id.*)  Dr. Murphy further opined that Plaintiff could lift or carry 20 pounds occasionally, 10 pounds frequently, or 10 pounds constantly, and she could not engage in prolonged walking or standing.  (Tr. 527.) Plaintiff could use her hands for simple grasping, pushing and pulling, and fine manipulation.  (*Id.*)  She could occasionally push or pull, but never bend, squat, crawl, or climb.  (*Id.*)

3

Plaintiff attended physical therapy from June through October 2011.  (Tr. 528-553.)  She attended four sessions through University Hospitals but did not return due to scheduling conflicts.  (Tr. 532.)  Treatment notes indicate that Plaintiff found the physical therapy to help relieve her pain initially.  (Tr. 543.)

An October 2011 radiology report revealed degenerative joint disease in Plaintiff's right hip, with narrowing, sclerotic surfaces, and erosion, but no evidence of fracture dislocation, or soft tissue swelling.  (Tr. 554.)

In March 2012, Dr. Murphy completed a second fill-in-the-blank, check-box medical source statement form in which she opined that Plaintiff: could lift no more than 10 pounds on an occasional or frequent basis; could stand or walk for one hour total in an eight-hour day; could sit for eight hours in an eight-hour day, but only for two hours without interruptions; could rarely or never climb, balance, stoop, crouch, kneel, or crawl; could frequently reach, handle, feel, push/pull, and perform fine or gross manipulation; and must avoid heights and moving machinery.  (Tr. 602.)  Dr. Murphy opined that Plaintiff experienced severe pain, but did not need to rest for some time period during an eight-hour workday and did not require an assistive device to ambulate.  (*Id.*)  Dr. Murphy further opined that Plaintiff required an at-will sit/stand option.  (*Id.*)

In June 2012, Plaintiff reported a history of hypertension, depression, anxiety, bipolar disorder, and arthritis in both hips.  (Tr. 622.)  Usha Mehta, M.D., examined Plaintiff, recorded unremarkable results, and prescribed medication.  (Tr. 622-623.)

### b. Agency Reports

On October 19, 2011, Adi Gerblich, M.D., conducted a consultative evaluation of

Plaintiff at the request of the Bureau of Disability Determination.  (Tr. 556.)  Plaintiff's

chief complaints included hypertension, bipolar disorder, and osteoarthritis.  (*Id.*)  Dr.

Gerblich noted that Plaintiff's gait was limited and that she could walk one city block and

climb one flight of steps, although with pain.  (*Id.*)  A physical examination was

unremarkable.  (Tr. 557.)  Plaintiff had slightly decreased muscle power in her hip

flexors and extensors, but all other areas maintained full strength.  (*Id.*)  She had limited

range of motion in her dorsolumbar spine and hips and a stiff and slow gait.  (*Id.*)

Plaintiff walked with a cane, which she reportedly used all the time for assistance.  (*Id.*)

Dr. Gerblich's impression included hypertension, bipolar disorder, and degenerative joint

disease.  (*Id.*)  He opined that Plaintiff had a significant mobility limitation due to

degenerative joint disease.  (*Id.*)

On October 31, 2011, Gerald Klyop, M.D., reviewed the record and opined that

Plaintiff could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds;

stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-

hour workday; and push and/or pull on an unlimited basis.  (Tr. 75.)  Dr. Klyop further

opined that Plaintiff could occasionally stoop and climb ramps and stairs; frequently

balance, kneel, and crouch; and never climb ladders, ropes, or scaffolds.  (*Id.*)  He also

opined that Plaintiff must avoid moderate exposure to hazards.  (Tr. 76.)

2.    **Mental Impairments**

a.    **Medical Reports**

In March 2010, Plaintiff received inpatient mental health treatment for depression

and a crack-cocaine relapse after two years of sobriety.  (Tr. 267.)  She exhibited

suicidal ideation, stating that she considered overdosing.  (Tr. 251.)  A mental status

examination revealed unremarkable results, including that Plaintiff was alert, focused, oriented, and engaged.  (Tr. 267.)  She described her mood as "rather good," and her affect was full-range and congruent with her mood.  (*Id.*)  She made good eye contact and her speech was organized, coherent, and appropriate in volume and pace.  (*Id.*)  Her thought processes were logical, structured, and goal-based.  (*Id.*)  At the time of her discharge, Plaintiff's Global Assessment of Functioning (GAF) score was 60.[1]

In November 2010, Plaintiff reported increased depression, lack of motivation, and irritability, and she complained of having "dreams" and "flashbacks" about childhood sexual abuse.  (Tr. 444.)  Kathleen Kline, LISW, observed that Plaintiff was anxious and depressed, but her mental status examination findings were otherwise unremarkable.  (Tr. 443-445.)  Ms. Kline assessed Plaintiff's GAF score at 70, indicating mild symptoms.[2]  (Tr. 445.)

On January 21, 2011, Plaintiff reported that she had a poor relationship with her husband and alleged that she was experiencing flashbacks.  (Tr. 441.)  She stated that she had not used crack cocaine for three and a half months.  (*Id.*)  Plaintiff reported that she had to quit her job because she was not functioning and that she missed several counseling appointments because she was "too paralyzed and immobilized to come out

---

[1]     The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness devised by the American Psychiatric Association.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

[2]     A GAF score between 61 and 70 indicates mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, having some meaningful interpersonal relationships.

of house." (*Id.*)  Sara Stein, M.D., prescribed medications.  (*Id.*)

Mental status findings from January and February 2011 were generally unremarkable, including appropriate appearance and cooperative attitude; calm mood; appropriate speech and though content; full orientation; good memory, insight, and judgment; and normal motor behavior.  (Tr. 435, 437, 439.)  Plaintiff denied suicidal and homicidal ideation.  (*Id.*)  She reported that her medication had a calming effect, but it increased her craving for street drugs.  (Tr. 435.)

In May 2011, Barbara Eady, LISW, recorded normal mental status examination findings.  (Tr. 484.)  Treatment notes from June 2011 reveal that Plaintiff missed several appointments and was not taking any medication.  (Tr. 482.)  Plaintiff complained of anxiety attacks and cravings for drugs, but reported that she had been sober for six months.  (*Id.*)  Shila Matthew, M.D., reported normal mental status evaluation findings, diagnosed bipolar disorder, prescribed medication, and recommended additional psychotherapy.  (Tr. 483.)

Plaintiff was hospitalized due to suicidal ideation in February 2012 after relapsing and using crack cocaine for four days.  (Tr. 613.)  Upon admission, Plaintiff denied homicidal and suicidal ideation, hallucinations, and delusions.  (*Id.*)  Avtar Saran, M.D., observed that she was fully oriented, and her recent and remote memory, insight, and judgment were fair.  (*Id.*)  Plaintiff exhibited no signs of helplessness or hopelessness, her activities of daily living were good, and she was "up and about" on the unit.  (*Id.*)  Dr. Saran assessed Plaintiff's GAF at 60.  (Tr. 614.)

Plaintiff saw Lois Nicholson, CNS, in February 2012.  (Tr. 615-619.)  Nurse

Nicholson's findings were generally unremarkable, including appropriate appearance and hygiene; euthymic mood and congruent affect; cooperative attitude; appropriate speech; normal thought content; logical thought process; full orientation; good memory; good insight and judgment; intact cognitive functioning; and normal motor behavior.  (Tr. 617.)  Plaintiff denied suicidal and homicidal ideation.  (*Id.*)  Nurse Nicholson completed a check-box medical source statement regarding Plaintiff's mental capacity.  (Tr. 599-600.)  Nurse Nicholson opined that Plaintiff had poor ability to: maintain concentration for extended periods of two-hour segments; deal with work stress; and complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.*)  She opined that Plaintiff had a fair ability to: use judgment; respond appropriately to changes in routine settings; maintain regular attendance and be punctual within customary tolerance; deal with the public; relate to co-workers; interact with supervisors; function independently without special supervision; and work in coordination with or proximity to others without being unduly distracted or distracting. (*Id.*)  Nurse Nicholson further opined that Plaintiff had a fair ability to understand, remember, and carry out complex job instructions; understand, remember, and carry out detailed, but not complex, job instructions; socialize; behave in an emotionally stable manner; relate predictably in social situations, and manage funds/schedules.  (Tr. 600.)  Plaintiff had a very good ability to maintain her appearance. (Tr. 600.)  She had a good ability to: follow work rules; understand, remember, and carry out simple job instructions; and leave home on her own.  (Tr. 599-600.)  Samareh Moussavand, M.D., signed off on the assessment.  (Tr. 600.)

8

### b. Agency Reports

In May 2011, consultative examiner Paul Tangerman, Ph.D., reviewed the evidence and opined that Plaintiff was moderately limited in the ability to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (Tr. 61-62.)  Dr. Tangerman further opined that Plaintiff is capable of: completing 3-4 step tasks in an environment where duties are routine; completing tasks that involve superficial contact with the general public; and completing tasks in a static work environment.  (*Id.*)   In October 2011, Robelyn Marlow, Ph.D., reviewed the record and concurred with Dr. Tangerman's opinion.  (Tr. 76-78.)

### C.     Hearing Testimony

### 1.     Plaintiff's Hearing Testimony

Plaintiff testified that she injured her back while working as a hotel housekeeper. (Tr. 28.)  She stated that the primary issues that kept her from working were degenerative disc disease in her back, degenerative joint disease in her hips, and bipolar disorder.  (Tr. 30.)  Plaintiff also had arthritis in her hip.  (Tr. 31.)  She stated that it was difficult for her to stand and walk and that her daughter helped her bathe and

9

dress.  (*Id.*)  She was constantly in pain.  (Tr. 35.) Plaintiff participated in physical

therapy but testified that she did not notice any improvement in her hip pain.  (Tr. 32.)

She did not take narcotic pain medications due to her history with illegal drug use.  (Tr.

33.)  Plaintiff saw a counselor and psychiatrist for depression.  (Tr. 36.)  She stated that

her bipolar disorder and depression affected her ability to concentrate.  (Tr. 37.)  Plaintiff

visited with family and friends two or three times per week.  (Tr. 38.)  She often went

shopping with her daughter.  (*Id.*)

### 2.    Vocational Expert's Hearing Testimony

Mark Anderson, a vocational expert, testified at Plaintiff's hearing.  The ALJ

asked the VE to consider a hypothetical individual similar to Plaintiff in age, education,

and work history.  (Tr. 46.)  The individual could engage in light exertion work; could

never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs as well

as stoop; could frequently kneel, balance, crouch, and crawl; and must avoid moderate

exposure to hazards.  (*Id.*)  The individual could understand, remember, and carry out

instructions consistent with performing work at specific vocational preparation (SVP)

levels 1 and 2[1]; maintain concentration, persistence, and pace for two hour blocks of

time; would be limited to occasional interaction with the general public, co-workers, and

supervisors; and would be limited to routine, minor type changes in the workplace.  (*Id.*)

The individual would require a sit/stand option, defined as where the essential job duties

---

[1]    SVP ratings indicate how long it takes a worker to learn how to do his or
her job at an average performance level.  A rating of SVP 1 means a short
demonstration is the amount of training required to learn the job, and a
rating of SVP 2 means up to one month of training is required to learn the
job.

could be performed in either a seated or standing position with no significant off task time.  (Tr. 47.)  Furthermore, the individual would require a cane for ambulating distances.  (*Id.*)  The ALJ testified that the hypothetical individual would be capable of performing such jobs as an inspector and hand packager; an assembler of small products; and an electronics worker.  (Tr. 48.)

### III.  STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the

impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since January 7, 2011, the application date.

2.    The claimant has the following severe impairments: osteoarthritis and degenerative joint disease of the hips, lumbar strain, anxiety, and substance abuse.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, as defined in 20 CFR Part 416.967(b) except:
    - She requires a sit stand option such that the essential job duties could be performed in either a seated or standing position with no significant off task time.
    - She requires a cane for ambulating distances.
    - She can never climb ladders, ropes, or scaffolds.
    - She can occasionally climb ramps or stairs as well as stoop.
    - She can frequently kneel, balance, crouch, or crawl.
    - She is to avoid moderate exposure to hazards.
    - She can understand, remember, and carry out instructions consistent with performing work at SVP

12

> levels one and two.
> - She can maintain concentration, persistence, and pace for two hour blocks of time.
> - She is limited to occasional interaction with the general public, coworkers, and supervisors.
> - She is limited to routine, minor type changes in the workplace.

5. The claimant is unable to perform any past relevant work.

6. The claimant was born in February 1960, and was 50-years-old, which is defined as an individual closely approaching advanced age, on the date the application was filed.

7. The claimant has at least a high school education and is able to communicate in English.

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Act, since January 7, 2011, the date the application was filed.

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence,

13

regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B. Plaintiff's Assignment of Error

#### 1. The ALJ Erred in Analyzing Plaintiff's Pain and Credibility.

Plaintiff argues that the ALJ erred in failing to give adequate consideration to her credible complaints regarding her combined physical and mental impairments. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). However, the ALJ's credibility determinations must be reasonable and based on evidence from the record. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver*

*v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983).  The ALJ also must provide an adequate explanation for her credibility determination.  "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'"  S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.).  Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight."  *Id.*

When a claimant complains of disabling pain, the Commissioner must apply a two-step test known as the "Duncan Test" to determine the credibility of such complaints.  *See Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)).  First, the Commissioner must examine whether the objective medical evidence supports a finding of an underlying medical condition that could cause the alleged pain.  *Id.* Second, if there is such an underlying medical condition, the Commissioner must examine whether the objective medical evidence confirms the alleged severity of pain, or, alternatively, whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged severity of pain.  *Id.* In making this determination, the ALJ must consider all of the relevant evidence, including six different factors.[2]  *See Felisky,* 35 F.3d at 1039–40 (citing 20 C.F.R. §

---

[2] These factors include the following:
    (1) the claimant's daily activities;
    (2) the location, duration, frequency, and intensity of the claimant's
    alleged pain;

404.1529(c)).  Courts are not required to discuss all of the relevant factors; an ALJ may satisfy the Duncan Test by considering most, if not all, of the relevant factors.  *Bowman v. Chater,* 132 F.3d 32 (Table), 1997 WL 764419, at *4 (6th Cir. Nov. 26, 1997) (per curiam).

Here, a review of the ALJ's decision reveals that the ALJ discussed most, if not all, of the relevant factors in her assessment of Plaintiff's physical and mental condition. (Tr. 90-93.)  The ALJ examined Plaintiff's daily activities, her treatments and her responses to those treatments, the clinical examination findings, and the physician statements of record.  (*Id.*)  Thus, the ALJ considered the relevant evidence.

Moreover, in assessing Plaintiff's physical and mental limitations, the ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her alleged symptoms were not entirely plausible and "certainly not to the extent that she should be found to be disabled from all manner of work."  (Tr. 90-91.) Thus, the ALJ did not reject Plaintiff's subjective complaints altogether; rather, she determined that her RFC assessment adequately accounted for Plaintiff's limitations based on a careful consideration of the evidence.  In finding that Plaintiff was capable of performing a limited range of light work despite her limitations, the ALJ discussed the

---

(3) precipitating and aggravating factors;
(4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain;
(5) treatments other than medication that the claimant has received to relieve the pain; and
(6) any measures that the claimant takes to relieve his pain.

16

following evidence:

- Plaintiff had moderate restriction in activities of daily living, as she testified that she is capable of basic self care.  (Tr. 89.)

- Plaintiff had moderate difficulties in social functioning.  (Tr. 89.)  She testified that she saw family and friends regularly, and she was consistently cooperative during her mental status examinations.  (*Id.*)

- Plaintiff had moderate difficulties with regard to concentration, persistence, or pace, as no provider has ever noted on mental status exam that Plaintiff had deficiencies in cognition or memory.  (Tr. 89.)

- After four sessions of physical therapy, Plaintiff made progress toward her goals.  (Tr. 91.)  Due to her progress, additional sessions were approved for Plaintiff, but she chose not to attend them.  (*Id.*)  The ALJ found that this was inconsistent with Plaintiff's allegations that she is in intense pain that interferes with all activity and limited the credibility of her allegations.  (Tr. 93.)  The ALJ noted that "[t]o not pursue a working treatment shows that her pain is not as great as she alleges."  (*Id.*)

- Consultative examiner Dr. Gerblich reported that Plaintiff's hip strength was mildly reduced, that she walked with a cane, and that she had limited range of motion due to pain.  (Tr. 91.)  The ALJ incorporated this opinion in her residual functional capacity (RFC) finding, as it was supported by x-ray and range of motion testing.  (*Id.*)  The ALJ accounted for Plaintiff's hip pain and difficulty ambulating by limiting her to, *inter alia*, work that allowed for a sit/stand option and use of a cane for ambulating distances.  (Tr. 90.)

- Plaintiff's psychological treatment was sporadic and minimal.  (Tr. 92.)

- Plaintiff admitted to crack use in March of 2011, but told Dr. Mathew that she had been clean for six months in June of 2011.  (Tr. 92.)  The ALJ found that this showed Plaintiff was not a reliable historian when relating symptoms.  (*Id.*)

- The ALJ noted that while Plaintiff testified that she received extensive treatment for her hips, there is little record of such treatment.  (Tr. 93.)

Thus, the ALJ specifically compared Plaintiff's alleged physical and mental health

symptoms to other evidence in the record and found that Plaintiff's subjective complaints

were inconsistent with the objective evidence.  This inconsistency is an appropriate basis for an adverse credibility finding.  *See* *Walters v. Comm'r of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("Discounting credibility . . . is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence.")  Furthermore, the ALJ's recognition that Plaintiff was not a reliable historian and chose not to pursue treatment that was improving her condition is also a proper basis for finding her to be less than fully credible.

Moreover, as the Commissioner notes in her Brief, although the ALJ found that Plaintiff's subjective complaints were not fully credible, she nonetheless credited them to an extent and properly accounted for them in her RFC determination.  The ALJ accounted for Plaintiff's degenerative joint disease of the hips and lumbar strain by finding that she required a sit/stand option and a cane for walking distances.  (Tr. 90.)  She accounted for Plaintiff's alleged difficulties in performing postural activities by limiting her to never climbing ladders, ropes, or scaffolds and only occasionally climbing ramps and stairs and stooping.  (*Id.*)  Furthermore, the ALJ accounted for Plaintiff's mental limitations by limiting her to unskilled work that required her to maintain concentration, persistence, and pace for two-hour blocks of time only, with no more than occasional interaction with the general public, co-workers, and supervisors, and only routine, minor changes in the workplace.  (*Id.*)  For the foregoing reasons, the Court finds that the ALJ adequately conducted a proper pain and credibility analysis, and Plaintiff's second assignment of error does not present a basis for remand.

> **2.**    **The ALJ Erred in Failing to Assign Appropriate Weight to the Opinions of Plaintiff's Examining Physicians.**

18

Plaintiff argues that the ALJ erred in evaluating the medical opinions of record. Specifically, Plaintiff maintains that the ALJ erred by failing to give proper weight to the opinions of Dr. Murphy, Dr. Gerblich, and Dr. Moussavand.  The Court will address each opinion separately.

### a.    Dr. Murphy

Dr. Murphy provided two opinions regarding Plaintiff's physical capabilities.  On September 22, 2011, Dr. Murphy opined that Plaintiff would not be able to perform prolonged standing or walking; she would be limited to lifting 10 pounds frequently; she could only occasionally push/pull; and she could not bend, squat, crawl, or climb.  (Tr. 526-527.)  Dr. Murphy concluded that Plaintiff's functional limitations were permanent and that she could not return to work even if accommodations were made for her disability.  (Tr. 526.) On March 12, 2012, Dr. Murphy opined that Plaintiff could lift 10 pounds occasionally and frequently; stand and walk for a total of one hour during an eight-hour workday and one-half hour without interruption; and sit for a total of eight hours during an eight-hour workday and two hours without interruption.  (Tr. 601.)  Dr. Murphy also opined that Plaintiff would require a sit/stand option due to severe pain. (Tr. 602.)

The ALJ gave "little weight" to Dr. Murphy's September 2011 opinion, explaining:

> This opinion was given after only a cursory examination, with no testing or history of treatment, and thus Dr. Murphy is not given deference as a treating source.  In addition, the lack of findings to support the opinion precludes giving it great weight.  Finally, while Dr. Murphy noted "severe" osteoarthritis in her opinion, her treatment notes refer to the claimant's condition as "moderately severe" that same day, and "moderate" three months later. (exh. 12F p3) Given the short treatment history, lack of findings, and this inconsistency, this opinion is treated as nothing more than a recitation of the claimant [sic] subjective complaints, and thus

19

given little weight.

(Tr. 91.)  The ALJ gave "some weight" to Dr. Murphy's March 2012 opinion in which Dr. Murphy opined that Plaintiff was limited to less than sedentary work with a sit/stand option.  (*Id.*)  The ALJ stated that the opinion was entitled to some weight, as Plaintiff required a sit/stand option, but that there were no findings or treatment notes in the record to support a limitation to sedentary work.  (*Id.*)  The ALJ further noted that Dr. Murphy mostly treated Plaintiff for hypertension.  (*Id.*)

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a

treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

Here, the ALJ adequately explained her reasons for giving less than controlling weight to Dr. Murphy's opinions, and substantial evidence supports her conclusion. First, as to Dr. Murphy's September 2011 opinion, the ALJ properly observed that the opinion was rendered after only a cursory examination, with no objective testing and a lack of treatment history.  (Tr. 91.)  Thus, it was reasonable for the ALJ to explicitly acknowledge that she did not give Dr. Murphy's first opinion the kind of deference the ALJ would normally give to a treating source.  Furthermore, the ALJ explained that Dr. Murphy's opinion was not supported by objective findings.  As the Commissioner notes, objective tests conducted prior to Dr. Murphy's opinion revealed fairly unremarkable results, including only moderate degenerative changes in Plaintiff's hips.  (Tr. 394-400, 463, 497.)  Additionally, the ALJ noted that Dr. Murphy's opinion was unreliable, as she inconsistently noted "severe" osteoarthritis in her opinion, but her treatment notes refer to Plaintiff's condition as "moderately severe" that same day and "moderate" three months later.  (Tr. 91.)  Moreover, the ALJ provided "good reasons" for assigning only "some weight" to Dr. Murphy's March 2012 opinion that Plaintiff was limited to less than sedentary work.  As the ALJ noted, there were no findings or treatment in the record to support a limitation to sedentary work, and Dr. Murphy treated claimant primarily for hypertension.  (*Id.*)  Accordingly, the ALJ did not err in her assessment of Dr. Murphy's opinions.

### b.    Dr. Gerblich

Plaintiff also challenges the ALJ's assessment of Dr. Gerblich's opinion.

21

According to Plaintiff, the ALJ erred by incorporating Dr. Gerblich's October 2011 opinion into her RFC determination without accounting for Dr. Gerblich's opinion that Plaintiff had "significant mobility limitation due to degenerative joint disease." (Tr. 557.) This argument has no merit. The ALJ expressly acknowledged Dr. Gerblich's opinion that Plaintiff would have a significant mobility limitation and specifically stated that she included this opinion in her RFC determination. (Tr. 91.) Indeed, the ALJ accounted for Plaintiff's mobility limitation by limiting her to, *inter alia,* work requiring a sit/stand option such that the essential job duties could be performed in either a seated or standing position with no significant off task time; work where a cane could be used for ambulating distances; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs and stooping; and frequent kneeling, balancing, crouching, or crawling. (Tr. 90.) Plaintiff fails to explain how the ALJ's RFC does not adequately account for Plaintiff's "significant mobility limitation." Accordingly, the ALJ did not error in her assessment of Dr. Gerblich's opinion.

### c.    Dr. Moussavand

Plaintiff argues that the ALJ erred in giving little weight to the February 2012 opinion of Nurse Nicholson, which was counter-signed by Dr. Moussavand. (Tr. 599-600.) With regard to the opinion, the ALJ noted:

> Nurse Nicholson gave an opinion . . . which appeared to be perfunctorily counter-signed by a physician, Dr. Moussarand, opining that the claimant has poor abilities to complete a normal workday, maintain attention, or deal with work stress. (exh. 13F) First, although I have considered Nurse Nicholson's opinion, because she is not an acceptable medical source, I decline to give her opinion controlling weight. Second, although Dr. Moussavand signed the statement, there is no evidence that he

22

> contributed to the creation or formation of the opinions and
> instead, it clearly appears as though Nurse Nicholson prepared
> the document and Dr. Moussavand co-sign [sic] it.  Third, there
> is only one sentence written as a narrative explanation for the
> opinion.  The sentence simply states as follows: "Patient on
> medication for anxiety, bipolar affective d/o."  No further details
> were provided.  Thus, there is insufficient explanation for the
> basis of the opinion.  As there is not mental status exam findings
> to support this opinion, it is given little weight.

(Tr. 92.)

Plaintiff argues that the ALJ incorrectly found that Nurse Nicholson completed the medical sources statement at issue and that Dr. Moussavand merely signed off on the form.  The form specifically states, however: "If form completed by LISW, counselor or psychiatric nurse, please have treating Psychiatrist co-sign."  (Tr. 600.)  Thus, it appears that Nurse Nicholson did complete the form, and that Dr. Moussavand co-signed it because he was required to.  Nonetheless, even if the opinion was rendered by Dr. Moussavand, a physician, the ALJ adequately explained her reason for rejecting it.  The ALJ did not give little weight to the opinion merely because it was completed by a nurse who was not an "acceptable medical source."  Rather, the ALJ explained that the opinion was entitled to little weight because it was based solely on the fact that Plaintiff was taking medication for anxiety and bipolar affective disorder.  (Tr. 92, 600.)  Moreover, the ALJ noted that mental status findings in the record failed to support the opinion.  (Tr. 92.)  Indeed, the following evidence in the record supports the ALJ's conclusion that Plaintiff was not as limited as Nurse Nicholson or Dr. Moussavand opined:

- Plaintiff had moderate restriction in activities of daily living, as she testified that she is capable of basic self care.  (Tr. 89.)

23

- Plaintiff had moderate difficulties in social functioning.  (Tr. 89.)  She testified that she saw family and friends regularly, and she was consistently cooperative during her mental status examinations.  (*Id.*)

- Plaintiff had moderate difficulties with regard to concentration, persistence, or pace, as no provider has ever noted on mental status exam that Plaintiff had deficiencies in cognition or memory.  (Tr. 89.)

- Plaintiff's psychological treatment was sporadic and minimal.  (Tr. 92.)

- In November 2010, Plaintiff had a GAF score of 70, indicating only mild symptoms.   (Tr. 91, 445.)   Her mental status at that time was essentially normal, with good recent and remote memory, intact cognition, and anxious and depressed mood.  (Tr. 91, 444-445.)

- Plaintiff's mental status was good through February 2011 and remained normal in May 2011.  (Tr. 92, 439, 484.)

- In February 2012, Nurse Nicholson noted that Plaintiff had a congruent affect, euthymic mood, and good memory, insight, judgment, and cognition.  (Tr. 92, 616.)

- State agency reviewing psychologists Drs. Tangeman and Marlow opined that Plaintiff was capable of: completing 3-4 step tasks in an environment where duties are routine; completing tasks that involve superficial contact with the general public; and completing tasks in a static work environment.  (Tr. 92, 61-62, 76-78.)

Accordingly, substantial evidence supports the ALJ's decision to assign little weight to the opinion of Nurse Nicholson, co-signed by Dr. Moussavand.  For the foregoing reasons, Plaintiff's second assignment of error does not present a basis for remand.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: December 9, 2014

24